**United States District Court**
**Northern District of Alabama**
**Southern Division**

| | |
|---|---|
| Thomas E. Dunn, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ]    CV-00-N-3589-S |
| | ] |
| RGIS Inventory Specialists, | ] |
| | ] |
| Defendant(s). | ] |

**ENTERED**
**FEB 2 6 2002**

**Memorandum of Opinion**

### I.   Introduction

The court has for consideration the motion of defendant RGIS Inventory Specialists (hereinafter "RGIS") for summary judgment, filed December 21, 2001. (Doc. # 37). RGIS claims that a judgment in its favor is warranted as a matter of law in this action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended. *See* 42 U.S.C. §§ 2000e, *et seq.* The essence of its argument avers an inability on the part of plaintiff Thomas E. Dunn to produce sufficient evidence to establish a prima facie case of retaliation against him by RGIS, or sufficient evidence to establish prima facie cases of a hostile work environment or constructive discharge.[1] The issues have been briefed by the parties and they were afforded an opportunity to be heard orally at its regularly scheduled motion docket on Monday, February 25, 2002. The motion for summary judgment is thus are ripe for decision, and, upon due consideration, will be granted.

---

[1] By apparent agreement between the parties, a claim of age discrimination pursuant to 29 U.S.C. § 621, *et seq.*, has been abandoned. (Doc. # 39, Ex. A).



## II.     Background

### A.     Undisputed Facts

RGIS is a Michigan general partnership engaged in the business of conducting physical inventories of merchandise situated in the retail operations of its clients. Mr. Dunn was employed at the Birmingham South District office of RGIS from April 27, 1988 until February 2, 2000. During his employment tenure, Mr. Dunn received several promotions; from hourly auditor to Team Leader in 1989, and from Team Leader to Area Manager in 1995. At the time of his resignation, Mr. Dunn maintained his position as Area Manager. His direct supervisor was Gary Crow, District Manager for the Birmingham South District Office. Overseeing the Birmingham South District was John Horgan, Operations Manager based in Nashville, Tennessee.

The responsibilities of an Area Manager include supervising a group of team leaders (who in turn supervise the teams that conduct the actual physical inventories of retail operations), as well as actually recruiting and training these team leaders. At some point during the summer of 1999, it became necessary for Mr. Dunn to select a new Team Leader. Mr. Dunn told Mr. Crow that Kevin Barkley, an African American, had expressed interest in the Team Leader position. Because of Mr. Barkley's employment status at the time he expressed his interest, it was necessary to first promote Mr. Barkley to the position of Assistant Team Leader, to ensure that he was properly trained and ready for the responsibilities associated with being a Team Leader. Mr. Barkley was eventually appointed to the position of Team Leader on December 30, 1999.

**B.     Disputed Facts**

Mr. Dunn contends that Mr. Crow was not at all pleased with his selection of Mr. Barkley as the new Team Leader. At some point prior to December 30, 1999, Mr. Crow allegedly told Mr. Dunn that he should have filled the position of Team Leader with a Caucasian, instead of an African American. This statement was reiterated on an occasion subsequent to Mr. Barkley actually assuming the role of Team Leader. Moreover, Mr. Crow allegedly told Mr. Dunn on several occasions that African Americans like Mr. Barkley are not as beneficial to the inventory process as Caucasians, and that Mr. Dunn should consider demoting or firing Mr. Barkley. During the weeks leading up to Mr. Dunn's resignation, Mr. Crow allegedly pressured Mr. Dunn to fire or demote Mr. Barkley. He frequently harassed Mr. Dunn regarding both Mr. Dunn's supervision of Mr. Barkley and Mr. Barkley's performance as Team Leader, and threatened to take disciplinary action against Mr. Dunn if Mr. Barkley was not demoted or fired.

An additional instance of discord between Messrs. Crow and Dunn appears to have occurred in relation to the inventory of a Brooks Brothers store on January 26, 2000 for which Mr. Barkley was immediately responsible. Although the parties are not in complete agreement as to what exactly occurred that night, the facts are clear that the inventory of the Brooks Brothers store did not take place as smoothly as all employees of RGIS would have liked, requiring several RGIS managers to scramble to ensure that the inventory was successfully executed. Following the Brooks Brothers inventory, Mr. Crow wrote a note to Mr. Dunn in response to what had occurred. Mr. Dunn maintains that Mr. Crow called

3

him an "ass-hole" and a "liar" in the note. (Doc. # 43, pp. 15-16). The note left by Mr. Crow reads:

> I did try to page you at 9:10 p.m. before I wrote this. No people from Kevin at Brooks. Why did you not check with him at 4:10 p.m. when we talked? If any concerns, since Wade, Pat and I were all here, why did you not communicate back with us? I guess I made a mistake in ass-u-ming it was done. I suggest daily checking with Kevin and his people in the future. No repeat of tonight can happen.

(Doc. # 38, p. 12; Doc. # 39, Ex. A). RGIS contends that the word "assuming" was hyphenated in the note based upon the common adage "if you have assumed something, you make an ass out of you and me." (Doc. # 38, p. 13). Although the reproduction submitted into evidence does not clearly demonstrate the presence of hyphens between the words "ass," "u," and "ming," the three words are each underlined twice.

Mr. Dunn's displeasure with Mr. Crow evidently came to a head following the Brooks Brothers inventory. He telephoned Mr. Horgan in Nashville and requested a transfer. He also stated that he could no longer work under Mr. Crow. Either Mr. Horgan or Mr. Dunn requested that the two meet. That meeting took place on February 2, 2000, in Birmingham, in Mr. Crow's office. According to Mr. Dunn, just prior to the meeting Mr. Crow told him that if he did not "rectify the Kevin [Barkley] situation, [he'd] had it."

The meeting lasted no longer than ninety seconds. Mr. Horgan apparently raised the issue of the Brooks Brothers inventory as well as Mr. Dunn's request for a transfer. Although the issue of transfer apparently never received much discussion, the parties agree that Mr. Horgan never refused to grant Mr. Dunn his request for transfer. The parties likewise agree that Mr. Dunn never raised his concerns about Mr. Crow's attitude and

4

comments regarding Mr. Barkley. What else happened during the meeting is unclear. According to Mr. Horgan, Mr. Dunn proceeded to excoriate Mr. Crow for approximately thirty to forty-five seconds. Mr. Dunn disputes this, but does not offer an alternative account, beyond stating that the men raised the issue of the Brooks Brother inventory and the transfer. All parties agree, however, that Mr. Dunn ended the meeting by standing up and telling Mr. Horgan, "Well, you can take this job and shove it up your ass. You will have your [company] van back in one hour."

### III. Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotations omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 n.22 (1998). The movant can meet this burden by presenting evidence showing that there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Once the moving party has met this burden, "the nonmoving party to go beyond the pleadings and by her own affidavits, or by

the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must grant a motion for summary judgment if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249 (citations omitted); *accord Dzikowski v. NASD Regulation, Inc. (In re Scanlon)*, 239 F.3d 1195, 1198 (11th Cir. 2001); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). In rendering its decision, "[a] court 'must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves*, 530 U.S. at 150).

## IV.   Discussion

As stated *supra*, RGIS moves for summary judgment on all claims alleged by Mr. Dunn: retaliation, constructive discharge, and hostile environment. The grounds upon which RGIS assails Mr. Dunn's claims are several, and though not all merit discussion, the

court will address the pertinent aspects of each individual claim, and the arguments in support of and in opposition to summary judgment, in turn.

**A.     Retaliation**

For Mr. Dunn to prevail on his retaliation claim, he must show (1) that he engaged in a statutorily protected expression; (2) that he suffered an adverse employment action; and (3) a causal link between the statutorily protected expression and the adverse employment action. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001); *see also Bass v. Bd. of County Comm'rs*, 256 F.3d 1095, 1117-18 (11th Cir. 2001); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th Cir. 1998). RGIS argues that none of these elements are satisfied. Although the court is unwilling to go quite so far, it agrees with RGIS on the more basic premise that Mr. Dunn cannot present a prima facie case of retaliation.

As noted *supra*, a prima facie case of retaliation requires a plaintiff such as Mr. Dunn to show *inter alia* that he suffered an adverse employment action.

> An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee. Conduct that falls short of an ultimate employment decision must meet some threshold level of substantiality ... to be cognizable under the anti-retaliation clause. In evaluating what actions meet that required level of substantiality, we recognize that Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace. Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, using both a subjective and an objective standard.

*Gupta*, 212 F.3d at 587 (citations and quotations omitted). RGIS maintains that Mr. Dunn cannot demonstrate that he suffered an adverse job action because he resigned. (Doc. # 38, pp. 33-34).[2] The predominantly "as-a-result-of" focus of this argument is somewhat misplaced – a fact of which RGIS is likely well aware – given the list of inapt cases cited in support of the proposition that a "voluntary" resignation bars as a matter of law a finding of adverse employment action. RGIS does contend, however, that Mr. Dunn is unable to demonstrate any specific instances of adverse employment action occurring prior to his resignation. (*Id.*, p. 34).

Mr. Dunn counters with a list of events that he contends demonstrates the presence of adverse employment action. The instances in relevant opposition include the following:

(1) Mr. Crow constantly paged him or called store locations where he would be to review "minute details of [Mr.] Barkley's performance trying to find the least little thing wrong . . .";

(2) Mr. Crow constantly complained about Mr. Barkley, and told Mr. Dunn "that he needed to let Mr. Barkley go . . .";

(3) Mr. Crow constantly criticized Mr. Dunn about his supervision of Mr. Barkley;
(4)
(4) Mr. Crow reduced Mr. Dunn's "authority to supervise his teams through [his] constant harassment . . .";

(5) Mr. Crow "pressured" Mr. Dunn to demote or fire Mr. Barkley;

---

[2] The court pauses here to briefly address a second argument posited by RGIS. In its Initial Submission accompanying its motion for summary judgment, RGIS argues that Mr. Dunn cannot demonstrate that he was subjected to an adverse employment action, because he is collaterally estopped from re-litigating the finding, made by the State of Alabama Board of Appeals for the Department of Industrial Relations, that he voluntarily left his employment and lacked good cause to do so. (Doc. # 38, pp. 29-32). As the record contains no evidence that this decision was subject to review by an Alabama state court, the decision has no preclusive effect on the issues presented here. *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 796 (1986); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 470 n.7 (1982).

(6)   Mr. Crow "threatened to take disciplinary action against [Mr.] Dunn if he did not demote or fire [Mr.] Barkley . . ."; and

(7)   Mr. Crow told Mr. Dunn a few minutes prior to their February 2 meeting with Mr. Horgan, "that if [he] did not 'rectify the Kevin [Barkley] situation, [he'd] had it."

(Doc. # 43, pp. 13-14).[3] In considering these instances of alleged adverse employment action, the court finds instructive the analytical framework utilized in a trio of cases from this circuit, *Bass v. Board of County Commissioners*, *Gupta v. Florida Board of Regents*, and *Wideman v. Wal-Mart Stores*.

The *Bass*, *Gupta* and *Wideman* courts each considered claims of unlawful retaliation brought pursuant to Title VII. In addressing the merits of those claims – and specifically the issue of the adverse employment action prong of the prima facie case – the courts measured the alleged instances of adverse employment action against the legal backdrop described *supra*. *See Bass*, 256 F.3d at 1118-19; *Gupta*, 212 F.3d at 587-90; *Wideman*, 141 F.3d at 1455-56. Each of the three courts found instances of adverse employment action.

In *Bass*, the court found the following to constitute adverse employment action: (1) the loss of routine work assignments; (2) the forced performance of custodial and clerical duties, usually under the supervision of less senior personnel; (3) the denial of opportunities to earn overtime pay, on-call pay, riding-out-of classification pay, and adjunct teaching pay (which were opportunities available to other training instructors); (4) the forced and unannounced transfer to a non-budgeted position that was not covered by union contract;

---

[3] The court notes here that it does not find relevant in the calculus of adverse employment action the note written by Mr. Crow to Mr. Dunn. First, the note clearly does not call Mr. Dunn an "ass-hole" or a "liar." Second, insofar as the court – in a light *most favorable* to Mr. Dunn – finds that the note implies that Mr. Crow called Mr. Dunn an "ass," the court reminds that parties that "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *Gupta*, 212 F.3d at 587.

9

(5) the forced taking of tests to retain paramedic pay (while other similarly situated individuals were not required to take such tests). *See Bass*, 256 F.3d at 1117-19. In *Gupta*, the court found the following to constitute adverse employment action: (1) the denial of a pay rise despite an above satisfactory evaluation by a supervisor; (2) the denial of an extension on the plaintiff's tenure clock (i.e., the period in which an untenured professor has to obtain tenure). *See Gupta*, 212 F.3d at 587, 590. In *Wideman*, the court found the following instances collectively constituted adverse employment action: (1) the requiring of plaintiff to work (without a lunch break) on a day she was scheduled off; (2) the issuance of written reprimands and a one-day suspension (where plaintiff's previous eleven months of employment had been without blemish); (3) a manager's solicitation of only negative statements about plaintiff from other employees; (4) a threat by one manager to "shoot her in the head"; and (5) the delay of authorization of medical treatment by a manager following plaintiff's suffering of an allergic reaction. *See Wideman*, 141 F.3d at 1455-56.

In *Bass*, the actions that did not constitute adverse employment actions included: (1) the ordering of plaintiff not to record in his work logs custodial and clerical work he performed; and (2) the destruction of his training programs, database files for documenting training, and graphic/multimedia material he had developed over a five-year period. *See Bass*, 256 F.3d at 1117. The court explained that "[t]hose actions were not objectively serious and tangible enough to alter [his] compensation, terms, conditions, or privileges of employment, [or deprive] him of employment opportunities or adversely affect . . . his status as an employee." *Id*. at 1118 (quotations omitted). In *Gupta*, the actions that did not constitute adverse employment actions included: (1) the placing of plaintiff on a university

10

search committee for a position at the university's Boca Raton campus, which prevented her from applying for that very position; (2) the assignment of plaintiff to teach more credit hours than other professors and to teach classes on three different campuses; (3) the refusal to grant plaintiff's request and assign her to teach a desired class; (4) the intentional delay of plaintiff's visa application to the Immigration and Naturalization Service; (5) the termination without notice of the informal resolution process involving her sexual harassment claim after she missed one deadline. *See Gupta*, 212 F.3d at 587-88. Like the *Bass* Court, the *Gupta* Court observed that the allegedly adverse employment actions listed supra were not "objectively serious and tangible enough to alter [her] compensation, terms, conditions, or privileges of employment, [or deprive] her of employment opportunities or adversely affects . . . her status as an employee." *Gupta*, 212 F.3d at 588. In reaching this conclusion, the court noted that the plaintiff did "not actually suffer any consequence." *Id*. "An action which, it turns out, had no effect on an employee is not an 'adverse' action." *Id*.

In the instant case – and as juxtaposed against both the applicable legal standards and examples discussed *supra* – the only actions taken against Mr. Dunn that might qualify as adverse are Mr. Crow's alleged disciplinary threats and the statement he made prior to the February 2 meeting: "if [you don't] 'rectify the Kevin [Barkley] situation, you've had it." The remaining instances fail to objectively rise to the level seriousness and substantial tangibility to qualify as adverse, as they do not alter Mr. Dunn's compensation, terms, conditions, or privileges of employment, or deprive him of employment opportunities or

11

adversely affect his status as an employee. *See Gupta*, 212 F.3d ay 587.[4] Furthermore, in considering the other alleged instances in light of the relevant law, the court finds that they too fail to rise to the standard of adverse employment action.

The law is clear that conduct falling short of an ultimate employment decision may still constitute adverse employment action, provided that it meets a threshold level of substantiality. The law is also clear that this threshold level encompasses actions that produce the suffering of tangible consequences. *See, e.g., Pennington v. City of Huntsville*, 216 F.3d 1262, 1267 (11th Cir. 2001) ("... decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action."); *Durley v. APAC, Inc.*, 236 F.3d 651, (11th Cir. 2000) (holding that when the adverse employment action alleged is constructive discharge, the employee must "demonstrate that working conditions were 'so intolerable that a reasonable person in her position would have been compelled to resign.'"); *Gupta*, 212 F.3d at 588 ("An action which, it turns out, had no effect on an employee is not an 'adverse' action."). Mr. Dunn has failed to come forward with any evidence demonstrating that he suffered tangible consequences through the alleged statements and behavior of Mr. Crow. The single source of evidence that might tend toward such proof – that Mr. Dunn's resignation was under duress, with Mr. Crow apparently the source of that duress – falls well below what is necessary, in light of the events surrounding it.

---

[4] Mr. Dunn's vague and unsubstantiated allegation that Mr. Crow reduced his authority to supervise through his actions and constant harassment does not provide the court sufficient grounds upon which to find the presence of adverse employment action. *Cf. Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 702 (11th Cir. 1998).

The undisputed facts demonstrate that prior to the meeting between Mr. Dunn and Messrs. Horgan and Crow, Mr. Dunn contacted Mr. Horgan via telephone and expressed an unwillingness to work under Mr. Crow and a desire for a transfer. When the men met several days later, Mr. Dunn made no attempt to express his desires for a transfer, despite the fact that Mr. Horgan inquired about the transfer issue and in no way communicated to Mr. Dunn that a transfer would be refused. Moreover, Mr. Dunn apparently made no effort at this meeting to communicate his displeasure with Mr. Crow's behavior toward Mr. Barkley to Mr. Horgan. In fact, the evidence essentially presents a scene where after some discussion among the three men that may or may not have been heated, Mr. Dunn told Mr. Horgan to "take this job and shove it up your ass." In this light – and given the meeting's proximity to the alleged threats made by Mr. Crow – the court finds the threats to fall well below the threshold necessary for a finding of adverse employment action.

The court likewise does not find the actions alleged suffered by Mr. Dunn – considered in totality – to rise to the level of an adverse employment action. In reaching this conclusion, the court finds instructive the *Durley* case cited *supra*. In *Durley*, the adverse employment action claimed by the plaintiff was conduct allegedly amounting to constructive discharge. *See Durley*, 236 F.3d at 658. In refusing to find the presence of an adverse employment action, the *Durley* Court explained: "[To demonstrate constructive discharge,] Durley was required to demonstrate that working conditions were so intolerable that a reasonable person in her position would have been compelled to resign." *Id*. (quotations omitted).

13

Mr. Dunn's situation, although not styled as such by name, essentially alleges an adverse employment action by constructive discharge. And as a recitation of those facts underlying this charge make clear, Mr. Dunn has not presented sufficient evidence for this court to conclude that Mr. Crow's behavior constituted constructive discharge. Simply put, Mr. Dunn has in no way established evidence proving the existence of a workplace so intolerable that a reasonable person would be compelled to resign. In this circuit, the demonstration of constructive discharge is no easy task. The standard of proof is higher than that necessary for a showing of a hostile work environment. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231-32 (11th Cir. 2001). In fact, a plaintiff establishes the existence of constructive discharge only after showing that working conditions have so deteriorated that they approach a level of intolerable. *See Hill v. Winn-Dixie Stores, Inc.*, 934 F.3d 1518, 1527 (11th Cir. 1991). Moreover, a plaintiff who fails to provide his employer notice and an opportunity to remedy the allegedly intolerable situation generally cannot succeed on a claim of constructive discharge. *See Kilgore v. Thompson & Brock Mgmt.*, 93 F.3d 752, 754 (11th Cir. 1996). In light of the evidence before it, the court is satisfied that Mr. Dunn has not demonstrated the existence of a constructive discharge.

The court therefore finds that Mr. Dunn has failed to establish the second element necessary for a prima facie case of retaliation. Considering the alleged instances of adverse employment action alone and in combination, the court finds them to fall short of what is necessary for a conclusion that an adverse employment action has occurred as a matter of law. Summary judgment on this claim is therefore due to be granted in favor of RGIS.

### B. Constructive Discharge

The court's consideration of the evidence and the relevant legal standards, set forth in the preceding discussion, are equally applicable to Mr. Dunn's actual claim of constructive discharge. Summary judgment is therefore due to be granted in favor of RGIS on this claim as well.

### C. Hostile Work Environment

The remaining claim presented by Mr. Dunn's complaint is a claim of hostile work environment. Although the arguments proffered in opposition to summary judgment do little to advance the merits of such a claim, the court will consider the evidence presented against the applicable legal standards.

> A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, No. 00-10554, 2002 U.S. App. LEXIS 10, *8-*9 (11th Cir. Jan. 2, 2002) (citations and quotations omitted); *cf. Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997).

At the outset, the court notes that Mr. Dunn is not himself a member of a protected class. This fact does not, however, appear fatal to his claim. *See Henson v. Dundee*, 682

F.2d 897, 901 (11th Cir. 1982); *EEOC v. Mississippi College*, 626 F.2d 477 (5th Cir. 1980); *but see Parr v. Woodmen of World Life Ins. Co.*, 791 F.2d 888, 891-92 (11th Cir. 1996); *Merriweather v. Alabama Dep't of Pub. Safety*, 17 F. Supp. 2d 1260, 1271 (M.D. Ala. 1998). Nonetheless, the vicarious nature of Mr. Dunn's claim immediately calls into question his ability to prove that the alleged workplace hostility "was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Miller v. Kenworth of Dothan, supra*. To prove this, Mr. Dunn must come forward with evidence demonstrating a work environment fraught with conduct that "a reasonable person would find hostile or abusive" and that he himself perceives as abusive. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (quotations omitted); *see also Merriweather v. Alabama Dep't of Pub. Safety*, 17 F. Supp. 2d 1260, 1272 (M.D. Ala. 1998). The latter aspect of this standard is a subjective consideration, and one rarely contested. *See Gupta*, 212 F.3d at 587. The former, objective aspect to this test, requires actual proof of severe and pervasive conduct. In measuring evidentiary proffers on this point, courts should consider:

> (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.

*Id.* (citations omitted); *see also Miller v. Kenworth of Dothan*, 2002 U.S. App. LEXIS 10, at *10. Courts must consider such proffers in their context and as a totality. Facts are not to be examined in isolation. *See Mendoza*, 195 F.3d at 1246. Together, though, the evidence

16

must demonstrate that plaintiff was exposed to sufficiently severe and pervasive conduct that created a hostile or abusive working environment. *See id.*

Having considered the facts as presented by the parties, the court finds itself largely in agreement with RGIS. "[W]hat is most striking about [Mr.] Dunn's claims herein is the utter lack of any allegation of a work environment permeated by any intimidation, ridicule, or insult...." (Doc. # 38, p. 42). The lone racially-oriented allegations relate to Mr. Crow's alleged statements that African Americans ("them," "they," "those people") are not proper selections for the role of Team Leader, and that Mr. Dunn should have appointed a Caucasian, instead of an African American, to the role of Team Leader.[5] However, Mr. Dunn admits that other African American employees have served in the position of Team Leader under Mr. Crow, and have received favorable endorsements by him for promotion. (Doc. # 38, pp. 22-23). Perhaps most telling here is the fact that Mr. Barkley retained his position as Team Leader for some time after Mr. Dunn's resignation, and actually returned to the position of Team Leader following a voluntary step down to the position of auditor. (*Id.*, pp. 8-9).[6]

---

[5] The court is not quite certain what Mr. Dunn would have it take from the fact that Mr. Crow apparently used a racially derogatory term once to describe an African American in 1966, and apparently still uses racially derogatory words while driving his car. No evidence has been submitted alleging the use of such language by Mr. Crow in the course of his RGIS employment or at an RGIS employee.

[6] As the parties appear in agreement as to the accuracy of these factual allegations, the court finds them relevant and appropriately considered for purposes of this motion. However, one of the evidentiary bases for these allegations is the affidavit of Mr. Barkley – an affidavit before the court in original and revised forms – to which RGIS naturally objects and seeks stricken from the record. (Doc. # 50).

Courts may disregard affidavits as "shams" only when "a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact and that party attempts thereafter to create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (quoting *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (quotations omitted)); *see also Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1342-43 (11th Cir. 2000) (citing *Van T. Junkins* with approval); *Rollins v. TechSouth, Inc.*, 833

Whether Mr. Dunn actually perceived the working environment at RGIS racially hostile is a question worthy of debate. But an inquiry into his subjective perceptions is not necessary. The court finds that no reasonable jury could conclude that the alleged statements of Mr. Crow rendered Mr. Dunn a victim of a racially hostile work environment. Summary judgment is therefore due to be granted on this claim as well.

### V.     Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 25th of February, 2002.

EDWIN NELSON
UNITED STATES DISTRICT JUDGE

---

F.2d 1525, 1530 (11th Cir. 1987) (same). Such extreme action is taken sparingly and with caution, however, for it risks the imposition of drastic sanctions simply for the failure or betrayal of memory. Moreover, a restrained application of this rule secures the traditional role of the trier of fact as the proper arbiter of an affiant's credibility. *See Rollins*, 833 F. 2d at 1530; *see also Tippens*, 805 F.2d at 953-54; *cf. Reeves v. Sanderson Plumbing Prods.*, 530 U.S. at 150-51. Only when an affidavit presents inherent inconsistencies with existing testimony should a court disregard its contents. *See Rollins, supra.*

The troubling aspect of the Mr. Barkley's revised affidavit is the fact that it is not at all clear to the court who revised the affidavit. As RGIS notes, Mr. Barkley did not properly execute and verify the revised contents of the affidavit, and without such the court cannot be certain that the revisions are in fact his. Given, however, the little reliance placed upon the affidavit by the parties, and the fact that the parts upon which this court has taken into consideration have been agreed to by both parties, the court finds the issue of the affidavit's viability a moot question.